SAUNDERS, Judge.
In this tort suit, defendant, Town of Mamou, appeals a judgment in favor of the plaintiff, Sharon Foster (Foster), finding the Town of Mamou (the Town) liable under both negligence and strict liability and awarding plaintiff $150,000.00, subject to a reduction'of a comparative fault finding of 50%. Plaintiff answers the appeal, objecting to the finding of comparative fault. We affirm, as amended.
FACTS
While walking through an alley at approximately 7:00 p.m. on October 28, 1989, Sharon Foster stumbled into an unmarked trench. Foster broke her heel bone and ultimately developed Reflex Sympathetic Dystrophy as a result of this fall.
THE ACCIDENT SITE:
The Town was excavating earth to uncover its main sewer line so that a local resident could tie into the line. The construction began on October 25, 1989. There was no lighting in the alley. The hole was six feet deep and approximately ten feet long and ran across the alley north to south. The excavation was improperly marked. Photographs of the scene indicated only one barricade was placed and it was placed in position to keep out vehicular traffic, but not pedestrian traffic. Plaintiff’s safety expert, John D. Roberts, testified that there should have been a physical barrier surrounding the hole and making it physically impossible for a person to fall into it. Additionally, according to Roberts, some type of illumination, such as amber lights or torch lanterns, should have been placed at various intervals around the perimeter of the hole. There was nothing to prevent pedestrians from walking into the hole at its northern edge. The deepest portion of the hole was nearly 5½ feet deep on the south, gradually sloping upward to IV2 feet deep. The east-west portion of the excavation was 4½ feet deep and approximately 4 feet wide.
At trial, Foster testified that she left her mother’s house at 6:55 p.m., at which time she stated “it was pitch black.” It was a Saturday night, October 28, 1989. She used the alley since it was a shortcut from her mother’s house to her own house nearby. She was walking at a normal pace when she suddenly stubbed her foot and sidestepped to the left. When she put her right foot down to regain her balance, it went down into the hole. She fell into the hole, hitting her arm and head, and landed on her right foot. Foster thinks she may have been unconscious for a short time. When she tried to stand up, the pressure placed on her right foot caused burning and throbbing. It was at this time that she knew that she had broken her foot in the fall.
Foster testified that she screamed for help. When none came, she crawled back to her mother’s house. Her mother called Mr. Buford Perron, a neighbor, who drove Foster to the Savoy Memorial Hospital in Mamou, Louisiana.
PLAINTIFF’S INJURY:
Prior to the fall and resulting injury, Foster never had any problems with her foot or leg.
At the emergency room on the night of the accident, Foster was seen by Dr. Gerald Murdock. Dr. Murdock took X-rays of her foot; however, no definitive diagnosis could be made at that time. Dr. Murdock requested that she return in two or three days for more X-rays.
Foster denies having any other accident that day.
*839 The following Monday, Foster visited Dr. Murdock in the emergency room at which time Dr. Murdock immobilized her foot.
A week and a half later, Foster went back to Dr. Murdock’s office because the pain in her foot and leg became “really unbearable.” Repeat X-rays were taken which showed a non-displaced cortical fracture of the oscalcis.[1] Dr. Murdock placed her foot and leg in a long length cast extending above the knee which she remained in until December, 1989. She also testified to constant burning and some throbbing when she walked too much.
On December 5, 1989, Dr. Murdock removed the long length cast and placed Foster in a short cast until December 20. On December 20, Dr. Murdock ordered more X-rays which showed that the fracture had healed. The cast was then removed.
Upon removing the short cast, Foster testified that she noticed that her leg was “shiny” and unusual to her. She stated, “And I had never seen my leg shiny like that. So it kind of scared me a little bit. I didn’t know what was going on.” She further testified that the burning was still there and that her right leg would “like be real hot ... and at other times my right leg would be really cold.”
Dr. Murdock’s deposition does not indicate that on December 20, 1989, Foster had any complaints of pain which were out of the ordinary. His notes did not reflect whether any swelling was present.
Dr. Murdock saw Foster again on January 5, 1990. At that time, her ankle was “quite stiff.” Sharon complained of pain as well as stiffness. Dr. Murdock recommended continuation of physical therapy and urged Foster to walk on the foot and exercise it to get it mobilized and to get over the stiffness. He testified that he was not unduly concerned; however, he did note that she was not progressing as fast as he would have liked.
On February 5, 1990, Dr. Murdock examined Foster again. She was complaining of pain in her heel. He urged Foster to walk on the foot but she stated it was too painful and requested a cane.
On Foster’s March 5, 1990, visit, Dr. Murdock referred her to Dr. Stephen Na-son, an orthopedic surgeon. She only saw Dr. Nason once, on March 23, 1990. Dr. Nason’s report indicated his finding of Reflex Sympathetic Dystrophy which involves the nerves that control pain, the blood vessels and sweating and is brought about by trauma. The full physiology of the disorder is not fully understood, but there is a theory that the nerves in the spinal cord itself actually become abnormal producing abnormal activity in the sympathetic nerves in the affected extremity which continue beyond the time of the actual healing of the trauma. If the syndrome is severe, it can result in complete disuse of an extremity if it goes untreated.[2] He recommended sympathetic nerve blocks and referred her to a specialist for this procedure. He also recommended vigorous physical therapy, with exercise and full weight bearing.
Foster’s last visit with Dr. Murdock was May 11, 1990, at which time she was still complaining and the symptoms of Reflex Sympathetic Dystrophy were still present. He referred Foster to Dr. Olga Arter, a pain specialist.
Dr. Arter’s deposition indicated that her original consultation with Foster was on September 6, 1990. Dr. Arter’s impression of the right foot was that Foster had Reflex Sympathetic Dystrophy. She recommended lumbar sympathetic blocks in conjunction with physical therapy to treat the dystrophy.
Dr. Arter examined Foster again and her opinion remained the same. Dr. Arter stated that the plaintiff did not have much swelling, but continued to have pain. As to her prognosis, Dr. Arter testified that there is no permanent disability if treated.
Dr. Arter also testified that Foster had a problem with alcohol abuse and smoking, which were aggravating factors of her condition. Dr. Arter expressed great concern *840 over Foster’s alcoholism and her inability to deal with Foster’s pain and get Foster well as long as she was drinking. She did testify that Foster would have to quit drinking before she would be willing to treat her.
Foster also visited with Dr. Steven Staires, a pain specialist, in Lafayette, Louisiana. Dr. Staires examined Foster on August 4, 1991. His deposition revealed that Foster told him that Dr. Arter never actually treated her because Dr. Arter would not treat her unless she would get help for her alcoholism. Dr. Staires contacted Dr. Ar-ter and confirmed that Dr. Arter felt that the patient had significant problems with alcoholism and substance abuse, and that the issue of drug abuse needed to be addressed in the context of pain treatment.
Dr. Staires had Foster see a physical therapist. After receiving the findings from this therapist, he saw Foster again on August 27, 1991. He noted that she had a number of myofascial pain problems, facet pain, and what appeared to be a mild case of sympathetic dystrophy in the right lower leg and foot. He also noted some atrophy or decreased size in the circumference of the right calf. These diagnoses concurred with those of Dr. Arter. Dr. Staires reported that Foster was 20% improved following the session with her therapist. The therapy included hands-on manipulation of the spine in order to attempt to regain full normal motion of the spine and other joints in the lower back. The back problems were secondary effects produced by the inability to bear weight on the foot and walk normally.
On the visit of August 27, 1991, Foster underwent an initial lumbar sympathetic block. There were indications of a good response to the block. Dr. Staires scheduled Foster for further manual therapy and further sympathetic blockade.
Foster returned to see Dr. Staires on September 3, 1991. After being examined by the physical therapist, Dr. Staires noted that Foster had a 40% improvement since the start of treatment. On this visit, Foster underwent a second lumbar sympathetic block. It was Dr. Staire’s opinion that Foster was pain-free at the time of discharge and that the relief from the pain lasted longer on the second block than it had on the first one.
Foster reported to him on her next visit, September 10, 1991, that she had six days of complete relief following the second block. This was a positive response. She received another block. During this visit, Foster confronted Dr. Staires with her financial problems. She never returned to Dr. Staires.
As to plaintiff's prognosis, Dr. Staires testified that after two or three more nerve blocks and therapy, Foster may become symptom-free or minimally symptomatic and be able to function without the necessity of surgery. He estimated that the costs of treatment would be approximately $3,000.00.
As a result of the pain, Foster testified that her activities had been reduced to sitting at home with her leg elevated. She could not cook, shop, garden, or clean house anymore. She had gained over 30 pounds as a result of becoming sedentary. Foster further testified that she had to forego the weekend trips to Crooked Creek with her four children.
As to her intimate life, Foster testified, “My sex life is not what it used to be.” She stated that she could very seldom go through the “intimate moments” without pain.
ACTION OF THE TRIAL COURT
After a bench trial, the trial judge issued the following reasons for judgment and findings of fact:
“Gentlemen, this is not an easy case for this Court to decide, to say the least. There is a gross disparity in some of the testimony and this Court has the burden of resolving that. In other words, the buck stops here. Please pay close attention to what I’m going to say. The Court finds, from a preponderance of the evidence, particularly the testimony of Mr. Bufford Perron, whom the Court considers a truthful and reputable witness, which testimony the Court considers to *841 be the tie breaker, and tips the scale in favor of the plaintiff’s favor, that the Town of Mamou breached it’s duty because it failed to properly mark and protect the hole or trench it had dug and that plaintiff, Foster, fell in the hole and injured herself. In short, the Town of Mamou was negligent. On the question of strict liability, the Court makes a finding of fact that the defendant, Town, had knowledge of the hole or the defect, because the Town employees had dug it and knew it was there. There is no question but that the trench or hole was in the care or the custody of the defendant, Town, and that by virtue of it’s not having had a barricade on the northern edge, had a vice or defect, and clearly occasioned an unreasonable risk of injury to another. Here the plaintiff Foster. Therefore, not only is the Town of Mam-ou liable to plaintiff under Louisiana Civil Code Article 2315, it is also strictly liable to her under Louisiana Civil Code Article 2317. Now, on victim fault. The Court finds that plaintiff, Foster, should have been aware of the presence of the hole or trench to some degree, since it was, and there is testimony that she visited the site of the digging to see when the gas would be turned on, since she lived on the corner of the alley and Chestnut, and she testified that she could see all of the way north to where the alley ended during the daytime, the Court believes she knew or should have known of the existence of the hole or trench. Although it was true that it was dark and the hole was unmarked, unbar-ricaded and unlit, and that she was distracted because she was concerned about the cash money she had left in her unlocked home, and that she was going home to get, she still should have sensed the presence of the hole or else not have used the alley. The Court will fix her comparative negligence or victim fault at 50% percent.”
On damages and quantum, the trial judge found:
“On damages and quantum. The Court finds as aforesaid, that the defendant’s negligence under both Civil Code Article 2315 and under strict liability under Article 2315, that that was the sole and proximate cause of the plaintiff’s accident as well as her ensuing injuries. As she fell in the hole, she broke her heel bone of her right foot and the Court finds as a fact that she ultimately developed reflex sympathetic dystrophy as a result of the fall and injury with secondary back pain. The fracture to her heel caused the reflex sympathetic dystrophy to develop and the evidence clearly shows here that she did not have that disease prior to her accident sued for. This will continue to cause her severe and substantial problems consisting of pain and suffering, partially disabling her and will handicap her to some extent, and that she was still suffering at the time of the trial, some two years and three months postaccident. However, the Court believes that plaintiff, Foster, did not take sufficient steps to mitigate her damages. For example, among other things, she refused to attend the Alcoholics Anonymous meetings so that Dr. Ar-ter, the pain specialist, could treat her. She has not gone to Dr. Staires on a regular basis, and in general, is being neglectful in not trying to heal herself. This does not, of course, defeat her claim, but minimizes and mitigates it. An award for her past, present and future and physical pain and suffering, disability, comfort, loss of enjoyment of life, etc. is in order. The Court does not believe that she has proven her loss of wages with the certainty required by law and will make only a nominal award, considering the type of employment she was engaged in. The Court considers that plaintiff has proved medical expenses of $5,687.50. The Court will make a lump sum award to Plaintiff, Foster, for her general damages, past, present and future, mental and physical pain and suffering, disability, discomfort, loss of enjoyment of life, etc., and her special damages in the amount of One Hundred Fifty Thousand ($150,000.00) Dollars, because the court believes that her injury is indeed a serious one, and the Court would have awarded her even *842 more had she attempted to mitigate her general damages. And the Court further opines that she will have some residual disability. The Court also includes in said award, special damages, including past and future medical expenses and nominal loss of wages because the Court considers her employment being only temporary, piecemeal and in all probability would have been short lived. The Court reminds counsel that this total award of $150,000.00 must be reduced by 50% percent, the percentage of victim fault or comparative negligence attributed to the plaintiff. The defendant is to pay all costs of these proceedings. Mr. Gremillion, prepare your judgment. Send it to the Court for signature. I will hold it for forty-eight hours before signing it for in case Mr. Hunter or Mr. Jarrell have any objection to its form or substance. If so, they will notify me during that period. If I do not hear from them within that time frame, I will sign the judgment.”
The Town of Mamou appeals from that judgment, contending: (1) the trial court erred in finding that Sharon Foster met her burden of proving an accident occurred; and, (2) the trial court erred in awarding excessive damages under the circumstances.
Plaintiff answered the appeal requesting: (1)that Foster's percentage of comparative fault should be reduced; (2) that Foster should be awarded an amount for impairment of earning capacity; and, (3) that the Town of Mamou be condemned to pay the legal costs in the trial court and on this appeal.
DISCUSSION

Did plaintiff meet her burden of proof?

Defendant contends that the plaintiff has not met the burden of proving every element of her cause of action, contending that the element of causation is lacking. The defendant argues that the only testimony provided in support of the plaintiff’s injuries, resulting from the fall into the hole, was her own self-serving testimony. The trial court made a credibility determination and found that plaintiffs injuries were caused by the fall. A court of appeal may not set aside a finding of fact by the trial court in the absence of manifest error or unless it is clearly wrong, and where there is conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though appellate courts may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In the instant case, the trial court evaluated all of the testimony and evidence and found that the plaintiff had shown by a preponderance of the evidence that she fell into the hole and that this fall caused her present injuries. The trial court stated in its reasons for judgment that it found the testimony of Buford Perron credible. In accepting this testimony, and the testimony of the plaintiff, the trial court came to its conclusion. After reviewing the evidence, we find that the trial court was not clearly wrong in its ruling.

Was the Award Excessive?

Defendant argues that the trial court’s award of $150,000.00 is excessively high. Before a trial court’s award for damages can be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case. A damage award should not be disturbed by the reviewing court absent a showing of a clear abuse of the discretion vested in the trial court. Reck v. Stevens, 373 So.2d 498 (La.1979).
It is only after an articulated analysis of the facts discloses an abuse of discretion, that resort to prior awards in similar cases is proper. Reck, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The appropriate procedure for testing whether the trier of fact has abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been *843 made by the fact finder. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir.1992).
Only after finding that the lower court abused its much discretion, can the appellate court disturb the award. Then, the appellate court may only lower an excessive award to the highest point or raise an inadequate award to the lowest point which is reasonably within the discretion afforded the trial court. Coco, supra.
Viewing the evidence in the light most favorable to the plaintiff and considering the severity, nature and duration of the injury, as well as the prognosis for recovery, we find that the trial court abused its discretion in awarding $150,-000.00.
We have reviewed the jurisprudence of injuries to the heel/foot/ankle, with emphasis on the following cases: Partin v. HCA Health Services, 569 So.2d 561 (La.App. 1st Cir.1990); Hicks v. Barney, 526 So.2d 391 (La.App. 4th Cir.1988); Muse v. New Orleans Public Service, Inc., 546 So.2d 506 (La.App. 4th Cir.), writ denied, 551 So.2d 1325 (La.1989). Plaintiffs fracture itself healed in six weeks and no surgery was required other than placing a cast on the foot. The foot condition was complicated by the development of the condition known as Reflex Sympathetic Dystrophy. We have found no cases dealing with this condition, however, due to the nature of the injury and the effect it had on the plaintiff—the unrelieved hours of pain; her subsequent endurance of swelling, sensitivity, alternating sweating and coolness of the area; plaintiffs present inability to withstand walking or standing for any length of time without pain or swelling; and the limitations on her mobility due to the dystrophy—we feel that an award of $50,-000.00 is a just and adequate award, and the most the trial court could have awarded for her injuries and the “nominal award” of lost wages referred to by the lower court.
Additionally, we add future medical costs of $3,000.00 for the blockade treatments recommended by Dr. Steven Staires. Therefore, we reduce the trial court’s award to $53,000.00 and amend the judgment to reflect the reduction.
PLAINTIFF’S ANSWER TO THE APPEAL
Plaintiff contests the trial court’s allocation of her fault at 50%. The manifest error/clearly wrong standard applies to the finding of proportionate fault. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The., trial court found that the plaintiff should have been aware of the presence of the hole to some degree, since there was testimony that she had visited the site of the digging to inquire as to when the gas would be turned back on; she lived on the corner of the alley and Chestnut Street; and she testified that she could see all the way north of the alley. Although the Town of Mamou breached its duty to warn under the facts and circumstances of the case, the plaintiff breached her duty to ascertain the safety of her walk through the alley, where she knew of the excavation activity. We find no manifest error in the trial court’s allocation of fault. Based upon this allocation, plaintiff’s award of $53,000.00 is reduced to $26,-500.00.
Plaintiff next complains that the trial court’s award should include an amount for impairment of earning capacity. The trial court found that the plaintiff’s employment was only temporary, piecemeal, and shortlived. At the time of the accident, plaintiff was working at Burke’s Lounge, filling in for another employee when that employee was off. She presented no check stubs or tax returns showing steady employment. One who claims an earnings incapacity must prove his loss with some reasonable degree of certainty. The award cannot be based on speculation, possibility, or conjecture. Wactor v. Pickens Lumber, Co., 505 So.2d 815 (La.App. 2d Cir.), writ denied, 508 So.2d 827 (La.1987). Under the circumstances where a plaintiff has worked as a barmaid on a very sporadic basis, and assuming she has not earned enough to file an income tax return, any projections of loss of earning capacity would be speculative. Therefore, we find *844 no manifest error in the trial judge’s handling of this item of damage.
Lastly, plaintiff requests costs of these proceedings to be cast to the defendant. The trial court, in its judgment, cast the costs of the proceedings below to the defendant. That part of the judgment will remain. We deny plaintiff the relief requested as to the costs on appeal. We apportion the costs of the appeal equally between both parties. ^
For the reasons stated above, the judgment of the trial court is affirmed as amended, and plaintiff’s award is reduced to $53,000.00 subject to a 50% reduction for comparative fault. Plaintiff is, therefore, awarded the amount of $26,500.00. Costs of the appeal are to be cast equally between the parties.
AFFIRMED AS AMENDED AND RENDERED.

. A fracture of the outer lining of the bone, which did not extend to the bone marrow.

. This explanation is taken from the depositions of Dr. Olga Arter and Dr. Steven Staires.